# EXHIBIT B

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Spectrum Five LLC; Does 1-10

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

NematicTO Inc.; Dedi Haziza



ENDORSED
FILED

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

SEP 17 2014

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Santa Clara Superior Court<br>191 North 1st Street<br>San Jose, CA 95113 | CASE NUMBER:<br>*(Número del Caso):*<br>114CV270709 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Matthew H. Fisher, Da Vega Fisher Mechtenberg LLP, 955 Benecia Ave., Sunnyvale, CA 94085, 408-758-8974

| DATE:<br>*(Fecha)* SEP 17 2014 | DAVID H. YAMASAKI<br>Chief Executive Officer, Clerk | Clerk, by<br>*(Secretario)* _____ | , Deputy<br>*(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Spectrum Five LLC

   under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
          ☒ other *(specify):* Limited Liability Company
4. ☒ by personal delivery on *(date):* 11/11/14

[SEAL]

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |

ATTACHMENT CV-5012

# CIVIL LAWSUIT NOTICE

**Superior Court of California, County of Santa Clara**
**191 N. First St., San Jose, CA  95113**

CASE NUMBER: 114CV270709

## PLEASE READ THIS ENTIRE FORM

*PLAINTIFF* (the person suing):  Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint, Summons*, an *Alternative Dispute Resolution (ADR) Information Sheet*, and a copy of this *Civil Lawsuit Notice*, and you must file written proof of such service.

*DEFENDANT* (The person sued):  You must do each of the following to protect your rights:

1. You must file a **written response** to the *Complaint, using the proper legal form or format,* in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons* and *Complaint*;

2. You must serve by mail  a copy of your written response on the  Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and

3. You must attend the first Case Management Conference.

**Warning: If you, as the Defendant, do not follow these instructions, you may automatically lose this case.**

*RULES AND FORMS:*  You must follow the California Rules of Court and the Superior Court of California, County of Santa Clara Local Civil Rules and use proper forms.  You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 99 Notre Dame Avenue, San Jose (408-882-2900 x-2926), www.scselfservice.org (Select "Civil") or from:

- State Rules and Judicial Council Forms:  www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms:  http://www.sccsuperiorcourt.org/civil/rule1toc.htm

*CASE MANAGEMENT CONFERENCE (CMC):*  You must meet with the other parties and discuss the case, in person or by telephone, at least 30 calendar days before the CMC.  You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

*You or your attorney must appear at the CMC.  You may ask to appear by telephone -- see Local Civil Rule 8.*

*Your Case Management Judge is:* Patricia Lucas          *Department:*     2

The 1st CMC is scheduled for: (Completed by Clerk of Court)
     JAN 2 0 2015
     Date: _____  Time: **3:00pm**    in Department: **2**

The next CMC is scheduled for: (Completed by party if the 1st CMC was continued or has passed)
     Date: _____  Time: _____  in Department: _____

*ALTERNATIVE DISPUTE RESOLUTION (ADR):*  If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

*WARNING:* Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

ENDORSED
FILED

SEP 17 2014

David H. Yamasaki, Chief Executive/Superior Court
County of Santa Clara, California
By_____
Deputy Clerk

1   Matthew S. Da Vega, State Bar No. 195443
    Matthew H. Fisher, State Bar No. 229532
2   DA VEGA FISHER MECHTENBERG LLP
    955 Benecia Ave.
3   Sunnyvale, CA 94085
    Tel. 408.758.8974
4   Fax. 805.246.1548

5   Attorneys for Plaintiffs
    NEMATICITO INC. AND DEDI HAZIZA

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF SANTA CLARA

10

11  NEMATICITO INC., a Delaware corporation;   Case No. 4 C V 2 7 0 7 0 9
    DEDI HAZIZA, an individual;
12                                              COMPLAINT FOR:
              Plaintiffs,
13                                              1.  INTENTIONAL
         v.                                         MISREPRESENTATION
14                                              2.  NEGLIGENT
    SPECTRUM FIVE LLC, a Delaware limited           MISREPRESENTATION
15  liability company; and DOES 1-10, inclusive;  3.  BREACH OF CONTRACT

16            Defendants.

17                                              DEMAND FOR JURY TRIAL

18

19

20

21

22

23

24

25

26

27

28                                                          BY FAX

─────────────────────────────────────────────
                COMPLAINT FOR DAMAGES

Plaintiffs allege as follows:

1.      All allegations made in this complaint are based upon information and belief, except those allegations which pertain to the named Plaintiffs, which are based on personal knowledge. The allegations of this complaint stated on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this complaint pursuant to California Code of Civil Procedure sections 410.10.

3.      Venue is proper in this Court because the events and transactions giving rise to this action took place in the County of Santa Clara, and because obligations were incurred and to be performed in the County of Santa Clara.

## GENERAL ALLEGATIONS

4.      Plaintiff NematicITO Inc. ("NematicITO") is a Delaware corporation with its principal place of business in Santa Clara County, California.

5.      Plaintiff Dedi Haziza is an individual residing in Santa Clara County, California.

6.      Defendant Spectrum Five LLC ("Spectrum Five") is a Delaware limited liability company, with its principal place of business in Washington, D.C.

7.      The true names and capacities, whether individual, corporate, associate or otherwise, of the Defendants named herein under the fictitious names of DOES 1 through 10, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs will ask leave of Court to amend this complaint and insert the true names and capacities of said Defendants when the same have been ascertained. Each of the Defendants designated herein as a "DOE" is legally responsible in some manner for the events and happenings herein alleged, and Plaintiffs' damages as alleged herein were proximately caused by such Defendants.

1          8.      NematicITO, led by Chief Executive Officer ("CEO") Dedi Haziza, is the owner of

2     proprietary mobile waveguide antenna systems.  The technology allows for the transmission of high

3     speed Direct Broadcast Satellite ("DBS") from geostationary satellites to mobile consumers on

4     airplanes and automobiles.  Separately from NematicITO, Mr. Haziza owns proprietary Liquid

5     Crystal Antenna Technology for use in cell phones and wireless base stations.

6          9.      In the summer and fall of 2013, NematicITO and Mr. Haziza held discussions with

7     major players and investors in the mobile industry, including Qualcomm, Inc., to bring their various

8     antenna technology products to market.  Spectrum Five Chief Operating Officer ("COO") Tom

9     Sharon traveled to San Jose, California to view NematicITO's technology.

10         10.     In September 2013, Sharon approached NematicITO with a proposal to license its

11    waveguide antenna for use by Spectrum Five and its customers in its various mobile satellite

12    communication systems.  Sharon knew of NematicITO and Mr. Haziza's concurrent negotiations

13    with other investors, including Qualcomm, as he had been previously involved in finding investors

14    for their products.

15         11.     Spectrum Five's initial offer to NematicITO provided for it to receive a percentage of

16    royalties from product sales.  Sharon further requested NematicITO to execute a right of first refusal

17    as it was presenting its technology to an "important investor." NematicITO declined to do so.

18    NematicITO and Mr. Haziza continued negotiations with Qualcomm, Spectrum Five, and other

19    investors through September and into October 2013.

20         12.     In mid-October, Plaintiffs closed in on a deal with Qualcomm, and Mr. Haziza asked

21    for Spectrum Five to return a prototype antenna it had sent it. Spectrum Five CEO David Wilson,

22    however, assured Mr. Haziza that Spectrum Five had just finalized a contract to build a second

23    satellite and was "now in a position to wrap our agreement with you."

24         13.     In a subsequent conversation with Mr. Haziza, Wilson significantly sweetened the

25    deal by promising to extend $1 million to NematicITO as a down payment prior to any sales of its

26    product.  Based on these representations, NematicITO and Mr. Haziza discontinued their discussions

27

28

1  with other potential investors and partners, including Qualcomm, and NematicITO finalized its deal

2  with Spectrum Five.

3    14. On or about November 27, 2013 NematicITO and Spectrum Five entered into a

4  Technology Licensing and Development Agreement ("the Agreement"). Mr. Haziza executed the

5  Agreement on behalf of NematicITO in the State of California.

6    15. The Agreement represented that Spectrum Five had secured rights to operate

7  geostationary satellites providing 12/17 GHz and 17/24 GHz (DBS) Service. The Agreement called

8  for NematicITO to provide Spectrum Five an exclusive license for its automotive and aeronautical

9  antennas, to be used in Spectrum Five's satellite system. Spectrum Five agreed, among other things,

10  to pay NematicITO $1,000,000 in fixed royalty payments as follows: (i)  $200,000 30 days after the

11  effective date of the Agreement; (ii) $300,000 30 days after successful completion of Critical Design

12  Review and delivery of a non-functional mockup model for the aviation product; (iii) $250,000 30

13  days after the completion of the prototype automotive antenna; and (iv) $250,000 30 days after

14  completion of the acceptance testing program for the automotive antenna. (Article III, Section 1(a)-

15  (b).) The Agreement also provided for NematicITO to receive royalties in the form of a percentage

16  of future product sales. Attached hereto as Exhibit 1 is a true copy of the Agreement.

17    16. That same day, Mr. Wilson emailed Mr. Haziza, stating "we look forward to working

18  with you to use the antenna to bring the best services at the best prices to market."

19    17. In the following month, NematicITO diligently proceeded to perform the Agreement

20  in good faith, completing industrial designs for the project.

21    18. Unbeknownst to NematicITO, however, Spectrum Five had no ability or intention of

22  performing its side of the contract. Spectrum Five had no satellite system that could utilize

23  NematicITO's technology. On information and belief, the Federal Communications Commission

24  ("FCC") had cancelled Spectrum Five's authorization to provide DBS 12/17 GHz service because of

25  its failure to complete milestones for the construction and launching of a satellite.

26

27

28

19. Spectrum Five then obtained a new FCC license for 17/24 ("Reverse-Band") GHz service, a different set of frequencies then used for DBS service. However, on information and belief, as of 2013, Spectrum Five had not: (1) applied for or even been granted an FCC license for DBS service on this frequency; (2) had not begun construction of any satellite; (3) had not raised even 25% of the financing necessary to do so; and (4) by its own estimate would not be in a position to launch any satellite until August 2016.

20. Moreover, on information and belief, as of November 27, 2013, Spectrum Five was subject to an FCC order authorizing a competitor of Spectrum Five to move its satellite into a new orbital position, which according to Spectrum Five would block its proposed Reverse-Band service.

21. Unsurprisingly, Spectrum Five failed to perform the Agreement with NematicITO in any form or fashion. When the December 27, 2013 payment date for the first $200,000 installment due under the Agreement passed, Sharon told Mr. Haziza that Spectrum Five was having difficulties in paying. Mr. Haziza was informed for the first time that there were legal issues related to Spectrum Five's securing their bands and satellite locations, as well as securing the necessary licenses for its satellites.

22. Both Sharon and Wilson, however, assured Mr. Haziza they were still committed to the project and intended to perform it once Spectrum Five overcame its financial hurdles. On the basis of the above, Spectrum Five asked for an extension until January 31, 2014 to make the first $200,000 payment.

23. However, Spectrum Five did not provide the funds on the extended date, either. Sharon repeated that, while Spectrum Five was still in a problematic situation, it remained committed to the deal.

24. On the basis of these representations, NematicITO continued to work on designs for the project and expended its own funds to do so in the absence of the promised funds from Spectrum Five.

25.     On February 6, 2014, in light of Spectrum Five's continuing default, Nematic sent it a Notice of Termination pursuant to the Agreement. However, following this, Wilson asked Mr. Haziza if Nematic would withdraw the Notice, since he was committed to the project and a termination letter would create problems with Spectrum Five's investors.

26.     In a February 9, 2014 phone call, Mr. Haziza and Sharon discussed Spectrum Five at least paying NematicITO's out-of-pocket expenses as a temporary measure until the full amount due could be provided.   However, Spectrum Five did not do so.  After February 12, Spectrum Five did not respond to NematicITO's further attempts at communication. As a result, on March 9, NematicITO sent it another Notice of Termination.

27.     As a result of Defendants' conduct as alleged herein, Plaintiffs have suffered damages, including but not limited to: (1) loss of $1,000,000 in promised "fixed royalty" payments pursuant to the Agreement; (2) loss of percentage royalty payments on antenna systems sales pursuant to the Agreement; (3) out-of-pocket expenses incurred by Plaintiffs in development of the project; (4) loss of business opportunity with other investors and potential partners to develop Plaintiffs' products; and (5) other damages, all in an amount to be proved at trial.

## FIRST CAUSE OF ACTION

### Fraud - Intentional Misrepresentation

### By All Plaintiffs Against Defendant Spectrum Five and Does 1 - 10

28.     Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the foregoing paragraphs, inclusive, as though fully incorporated herein and made a part hereof.

29.     In order to induce Plaintiffs to enter into and to continue to perform the Agreement, Defendant through its representatives David Wilson and Thomas Sharon made the following representations to Plaintiffs during a series of telephone conferences and written exchanges beginning in September 2013, and continuing through February 2014:

a.    That Defendant had the sufficient resources and had secured the necessary satellite operational rights to fulfill its obligations under the Agreement, including up-front payment of $1,000,000 in fixed royalty payments to NematicITO;

b.    That Defendant would honor its obligations under the Agreement, including exercising due diligence to bring plaintiffs' product to market; and

c.    That after its initial default, Defendant remained committed to the project and would act in good faith to cure its default and perform the Agreement.

30.    At the time Wilson and Sharon made the above representations, they were acting as Defendant's agents and representatives.

31.    These representations were a material part of the Agreement described herein. When Wilson and Sharon made these representations to Mr. Haziza they knew them to be false and made these representations with the intention to deceive and defraud Plaintiffs and induce them to act and continue to act in reliance on these representations. In fact, Defendant had no intention or ability of extending the $1,000,000 in promised fixed royalty payments or bringing Plaintiff's product to market. Defendant lacked the necessary financing and licensing rights to do so. Defendant instead intended through its representations to take Plaintiff's valuable product technology off the market for an extended period of time, with the purpose of keeping it out of its competitors' hands and/or selling it to an investor for a profit, without having to pay Plaintiff a right of first refusal fee.

32.    Defendant's intent to deceive Plaintiffs was indicated by its knowledge of Plaintiffs' negotiations with other partners, its prior attempt to compel Plaintiff to execute a right of refusal and present its product to an investor, its failure to perform any portion of the Agreement, and its repeated false representations that it remained committed to the project, followed by total lack of performance or communication with Plaintiffs.

33.    Plaintiffs reasonably relied on Defendant's representations given that it held itself out as an experienced, reputable business and did not disclose its lack of funding or failure to secure the necessary satellite licensures to perform the Agreement.

34.     The misrepresentations were the proximate cause of Plaintiffs having insufficient funds to complete the project, loss of out-of-pocket expenditures, and inability to bring their various antenna products to market.  Had Defendant not made these misrepresentations, Plaintiffs would have proceeded with another business partner capable of fully funding their various projects and would have brought their products to market in a timely manner.

35.     The above-described conduct has caused Plaintiffs to suffer substantial losses, including out-of-pocket expenditures, and lost profits, all in an amount to be proven at trial.

36.     The aforementioned statements were intentional misrepresentations made with the intention on the part of Defendant of removing Plaintiff's product from the market without compensation. In making these intentional misrepresentations, Defendant acted in a willful, wanton and malicious manner, in callous, conscious and intentional disregard for the interests of Plaintiffs, and with knowledge that their conduct was substantially likely to vex, annoy and injure Plaintiffs. As a result, Plaintiffs are entitled to recover exemplary and punitive damages.

## SECOND CAUSE OF ACTION

### Fraud - Negligent Misrepresentation

### By All Plaintiffs Against Defendant Spectrum Five and Does 1 – 10

37.     Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the foregoing paragraphs, inclusive, as though fully incorporated herein and made a part hereof.

38.     At the time Defendant and Plaintiff entered into the Agreement, Defendant represented that it had sufficient capital and satellite operating rights to complete the project, and that it would work in good faith and with diligence to bring Plaintiff's product to market.   These representations were a material part of the Agreement described herein.

39.     However, Defendant failed to disclose that it had failed to secure the necessary satellite operating rights and had no ability of developing the product or extending the $1,000,000 in promised fixed royalty funds to Plaintiff.

40.     When Defendant failed to disclose these facts it knew, or should have known, they were critical to Plaintiff's ability to successfully undertake and complete the project. It made the above described representations without any reasonable grounds for believing them to be true because of the lack of financing and licensure problems being experienced by Defendant.

41.     At the time these representations and failures to disclose were made and at the time Plaintiffs took the actions alleged herein, Plaintiffs were ignorant of the falsity of Defendant's representations and believed them to be true.

42.     Plaintiffs reasonably relied on Defendant's representations given that it held itself out as a reputable business and did not disclose its lack of financing or failure to secure the necessary satellite licensures to perform the Agreement.  Had Defendant not made these misrepresentations, Plaintiffs would have proceeded with another business partner capable of fully funding their projects and would have brought their products to market in a timely manner.

43.     The above-described conduct has caused Plaintiffs to suffer substantial losses, including out of-pocket expenditures, and lost profits, all in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**Breach of Written Contract**

**By Plaintiff NematicITO Against Defendant Spectrum Five and Does 1-10**

44.     Plaintiff NematicITO realleges and incorporates herein by reference each and every allegation contained in the aforementioned paragraphs, inclusive, as though fully incorporated herein and made a part hereof.

45.     As alleged herein, Defendant entered into a written Agreement with Plaintiff NematicITO.

46.     NematicITO has performed all conditions, covenants and promises required by it on its part to be performed in accordance with the terms and conditions of the Agreement, except for those it was prevented from performing or which were waived or excused by Spectrum Five's misconduct and breaches.

47.     Spectrum Five breached the Agreement by its conduct, including but not limited to the following:

        a.      Failing to pay any portion of the $1,000,000 in fixed royalty payments owed to NematicITO under the Agreement, including $200,000 due within 30 days of its execution;

        b.      Failing to exercise diligence in bringing NematicITO's product to the market;

        c.      Deceit and untruthfulness regarding its inability and lack of intention to perform its obligations under the Agreement; and

        d.      Otherwise acting in breach of the terms of the Agreement.

48.     As a proximate result of Defendant's breach of the Agreement, Plaintiff has been damaged in an amount to be proven at trial.

**PRAYER**

WHEREFORE, Plaintiffs pray for judgment as follows:

ON THE FIRST CAUSE OF ACTION:

For compensatory damages in an amount to be proved at trial.

For exemplary and punitive damages to be determined by the trier of fact.

ON THE SECOND AND THIRD CAUSES OF ACTION:

For compensatory damages in an amount to be proved at trial.

ON ALL CAUSES OF ACTION

1.      For interest;

2.      For costs of suit;

1    3.    For restitution;

2    4.    For attorneys' fees; and

3    5.    For such other and further relief as the Court may deem just and proper.

4

5    DATED:  September 17, 2014              DA VEGA FISHER MECHTENBERG LLP

6

7                                    By: _____

8                                          Matthew S. Da Vega
                                           Matthew H. Fisher
9                                          Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2

Plaintiffs hereby demand a jury trial for all issues so triable.

3

DATED:  September 17, 2014

DA VEGA FISHER MECHTENBERG LLP

4

5

By: _____

6

Matthew S. Da Vega
Matthew H. Fisher
Attorneys for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

# EXHIBIT 1

## Technology Licensing and Development Agreement

This agreement is made and entered into between NematicITO Inc., a Corporation established under Delaware State law (hereinafter called **Licensor**) having its principal office at 7411 Rainbow Drive Unit 12, Cupertino CA 95014,

and

Spectrum Five LLC ("Spectrum Five"), a limited liability company organized and existing under the laws of Delaware, having an office and place of business at 807 Las Cimas Blvd, Suite 270, Austin, TX 78746 (hereinafter called **Licensee**).

**WHEREAS,** Licensee has secured rights to operate geostationary satellites in the 12/17 GHz and 17/24 GHz Broadcasting-Satellite Service, as well as Fixed-Satellite Services in several bands between 8-40 GHz; and Licensor has developed proprietary mobile waveguide antenna systems capable of receiving satellite signals transmitted from space in these same bands; and

**WHEREAS,** Licensee wishes to obtain an exclusive license for the purchase and resale of Licensor's antenna system products under the terms and conditions hereinafter set forth:

**WHEREAS,** Licensee wishes to engage the Licensor in the development of an aeronautical antenna product and an automotive product using its patented technology:

**NOW, THEREFORE,** in consideration of the premises and the faithful performance of the covenants herein contained it is agreed as follows:

**Article I - DEFINITIONS**

For the purpose of this agreement, the following definitions shall apply:

1.  **Licensed Antenna Systems:** Shall mean:

    a.  Licensor's aeronautical mobile satellite antenna system, or any successor model capable of receiving/transmitting satellite signals in the Designated Frequency Bands and Designated Markets based on the Licensor's patented (including patentable and patent pending) steerable antenna technology as described in the patents enumerated in Attachment 1;

    b.  Licensor's terrestrial vehicle (automotive) mounted satellite antenna system (both after-market and OEM applications), or any successor model capable of receiving/transmitting satellite signals in the Designated Frequency Bands and Designated Markets based on the Licensor's patented (including patentable and patent pending) steerable antenna technology as described in the patents enumerated in Attachment 1;

    c.  Any and all improvements developed by Licensor, whether patentable or not, relating to the Licensed Antenna Systems, which Licensor may now or may hereafter develop, own or control.

d.   Any technology owned now or later developed by Licensor, which is not based on the waveguide technology described by in Appendix A, is excluded from this Agreement; however, Licensor agrees to negotiate in good faith the addition of any specific excluded technology identified by the Licensee as a modification to this Agreement.

2.   **Gross Sales:**  Shall mean total sales in U.S. dollars of the Licensed Antenna Systems.

3.   **Confidential Proprietary Information:**  Shall mean with respect to any Party all scientific, business or financial information relating to such Party, its subsidiaries or affiliates or their respective businesses, except when such information:

a.   Becomes known to the other Party prior to receipt from such first Party;

b.   Becomes publicly known through sources other than such first Party;

c.   Is lawfully received by such other Party from a party other than the first Party; or

d.   Is approved for release by written authorization from such first Party.

4.   **Exclusive License:**  Shall mean a license, including the right to sublicense, whereby Licensee's rights as described herein are sole and entire and operate to exclude others from use of the Licensor's patented steerable antenna technology in antenna systems on the Designated Frequency Bands in the Designated Markets, including Licensor and its affiliates, except as otherwise expressly provided herein.  The description of the technology pertaining to the Exclusive License and list of Licensee's patents relating to the Exclusive License is included as Attachment I to this Agreement.

5.   **Designated Frequency Bands:**  Shall mean the 12 GHz (12.2-12.7 GHz) "KuBSS" and 17 GHz (17.3-17.8 GHz) "KaBSS" Broadcasting-Satellite Service frequency bands for receive-only antenna technology, and the 11-12/14 GHz (10.95-12.2 GHz receive, 13.75-14.5 GHz transmit) "KuFSS" and 20/30 GHz (17.7-20.2 GHz receive, 27.5-30.0 GHz transmit) "KaFSS" Fixed-Satellite Service frequency bands.

6.   **Designated Markets:**  Shall mean the commercial and private aviation markets and the moving vehicle after-market/OEM market  in the Western Hemisphere (specifically the territory at all latitudes between the 20th meridian West and the diametrically opposed 160th meridian East).

7.   **Know-how:**  Shall mean any and all technical data, information, materials, trade secrets, technology, formulas, processes, and ideas, including any improvements thereto, in any form in which the foregoing may exist, now owned or co-owned by or exclusively, semi-exclusively or non-exclusively licensed to any party prior to the date of this Agreement or hereafter acquired by any party during the term of this agreement.

8.   **Intellectual Property Rights:** Shall mean any and all inventions, materials, Know-how,

2

trade secrets, technology, formulas, processes, ideas or other discoveries conceived or reduced to practices, whether patentable or not.

9. **Royalty (ies):** Shall mean revenues received in the form of cash and/or equity from holdings from Licensees as a result of licensing, selling, sublicensing or leasing of Licensed Antenna Systems.

### ARTICLE II- GRANT OF EXCLUSIVE LICENSE AND MAINTENANCE

1. Licensor hereby grants to Licensee the Exclusive License with the right to sublicense others, to purchase, use, sell and lease the Licensed Antenna Systems.

2. Licensor retains all Intellectual Property Rights with respect to the Licensed Antenna Systems, and all rights to license, use, sell, sublicense or lease antenna systems for operation in frequency bands other than those specified in this Agreement for the Licensed Antenna Systems and for operation on platforms outside the Designated Markets.

3. Maintenance of the exclusivity provided by this Agreement is subject to the Licensee maintaining the annual minimum buy quantities of Table 1 below. Minimum quantities for periods beyond 2020 shall be set forth by mutual agreement covering five-year increments between the Licensee and the Licensor.

Table 1:   Minimum Buys by Market

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| Minimum Buy Requirment for Exclusivity (measured an 18 month period beginning in the specified year) | Commercial Aviation | | 200 | 250 | 300 | 325 | 350 | 375 |
| Minimum Buy Requirment for Exclusivity (measured an 18 month period beginning in the specified year) | Automotive (After-Market and OEM) | | 500 | 30,000 | 100,000 | 250,000 | 500,000 | 500,000 |

4. The Exclusive License established in this Agreement shall terminate twelve (12) years after the effective date of this Agreement, unless an extension thereof is mutually agreed by the Licensor and Licensee.

5. Licensee shall affix or caused to be affixed on a visible part of each product incorporating the Licensed Antenna System the legend "Enabled by NematicITO", or a similar legend as elected by Licensor from time to time, and a logo of Licensor. Failure to comply with this requirement shall be construed as material breach of this Agreement.

### ARTICLE III- PAYMENTS AND BASELINE CONFIGURATIONS

1. **Royalties**. For the licensed herein granted:

3

a.     The Licensee shall pay Licensor a total  $1,000,000.00 fixed royalty payments under the following payment schedule: (i) $200,000.00 thirty (30) days after the effective date of this Agreement; (ii) $300,000.00 thirty (30) days after the successful completion of the Critical Design Review (CDR) described in Paragraph 2.b of Article III below and the delivery to Licensee of the non-functional mock-up model for the aviation product; (iii) $250,000.00 thirty (30) days after the completion of the prototype automotive antenna described in Paragraph 1.b of Article I above; (iv) $250,000.00 thirty (30) days after completion of the acceptance testing program for the automotive antenna as described in Paragraph 2.b of Article II below.

b.     Licensee shall pay a Royalty of seven percent (7%) of Licensee's Gross Sales of Licensed Antenna Systems of the type set forth in Paragraph 1.a of Article I above (including improvements relating thereto under Paragraph 1.c of Article I above). In the event the Licensed Antenna System is sold as an integrated component of a larger system, then the Royalty shall be the same percentage of a mutually agreed upon portion of the larger system's price. For sales in excess of $1,000,000 annually the royalty shall be reduced to 5%.

c.     Licensee shall pay a Royalty of five percent (5%) of Licensee's Gross Sales of the first 1,000 Licensed Antenna Systems of the type set forth in Paragraph 1.b of Article I above (including improvements relating thereto under Paragraph 1.c of Article I above).  Licensee shall pay a Royalty of three percent (3%) of Licensee's Gross Sales of all Licensed Antenna Systems after the first 1,000 Licensed Antenna Systems of the type set forth in Paragraph 1.b of Article I above (including any improvements relating thereto under Paragraph 1.c of Article I above). In the event a Licensed Antenna System is sold as an integrated component of a larger system, then the Royalty shall be either 3% or 5%, as appropriate to the number of Licensed Antenna Systems sold, of a mutually agreed upon portion of the larger system's price.  The Royalty payable under this paragraph is based on the total number of the relevant Licensed Antenna Systems sold during this Agreement, not annual sales.

d.     All sums payable by Licensee under this Paragraph 1 shall be paid to Licensor in U.S. dollars, and all sums payable under Paragraphs 1.b and 1.c shall be paid quarterly to Licensor.

2.     **Baseline Configuration: Aviation and Automotive Markets**

a.     Aviation Product: 18" (nominal) diameter KuFSS and KuBSS band antenna with dual-polarization capability with Minimum Gain of 32.5 dBi and G/T of (TBR) dB/°K at boresight, with scanning/tracking performance that duplicates or exceeds the receive antenna performance of the ThinAir KuFSS diameter antenna described in Attachment II. The aviation product tentatively utilizes an 8:1 elevation soft-switch (using the licensed technology described in Attachment

4

I) for elevation steering.

b.    Automotive Product: 9" maximum diameter KaBSS/KaFSS antenna (in-roof) with electronic elevation scanning over a 25-65° elevation angle, that provides switched polarization capability, and that provides minimum gain of 30.2 dBi and G/T of (TBR) dB/°K at boresight, with scanning / tracking performance that duplicates or exceeds the receive antenna performance of the ThinAir KuFSS diameter antenna described in Attachment II.  At the Critical Design Review ("CDR"), the Licensor will present, and Licensor and Licensee will mutually agree upon, the design for the prototype antenna that meets these requirements as well as the proposed design for the tracking system and associated electronics.  The final specifications and acceptance testing program for this antenna will also be mutually agreed upon at CDR. The automotive product will tentatively utilize a 4:1 soft switch (using the licensed technology described in Attachment I) for elevation steering.

3.    **Sublicenses.** The granting and terms of all sublicenses is entirely at Licensee's discretion provided that all sublicenses shall be subjected to the terms and conditions of this agreement.

4.    **Royalty rate when a sale is made:** A sale of Licensed Antenna Systems shall be regarded as being made upon receipt of payment in full by Licensee for such Licensed Antenna Systems.

**ARTICLE IV - REPORTS, BOOKS AND RECORDS**

1.    **Reports.** Within thirty (30) days after the end of the calendar quarter annual period during which this agreement shall be executed and delivered within thirty (30) days after the end of each following quarter annual period, Licensee shall make a written report to Licensor setting forth the Gross Sales of Licensed Antenna Systems sold, leased or used by Licensee and total sublicensing receipts during the quarter annual period. If there are no Gross Sales or sublicensing receipts, a statement to that effect shall be made by Licensee to Licensor. At the time each report is made, Licensee shall pay to Licensor the royalties or other payments shown by such report to the payable hereunder.

2.    **Books and records.** Licensee shall keep books and records in such reasonable detail as will permit the reports provided for in Paragraph 1 of this Article IV to be determined. Licensee further agrees to permit such books and reports to be inspected and audited by a representative or representatives of Licensor to the extent necessary to verify the reports provided for in Paragraph 1 of this Article IV; provided, however, that such representative or representatives shall indicate to Licensor only whether the reports and royalty paid are correct, if not, the reasons why not.

**ARTICLE V - DILIGENCE**

Licensee shall use its best efforts to market the Licensed Antenna Systems throughout the life of this agreement.

**ARTICLE VI - TERMINATION**

1.   **Termination by Licensee.**

     **Option of Licensee:**  Licensee may terminate the license granted by this agreement, provided Licensee shall not be in default hereunder, by giving Licensor thirty (30) days notice to its intention to do so.  If such notice shall be given, then upon the expiration of such thirty (30) days, the termination shall become effective; but such termination shall not operate to relieve Licensee from its obligation to pay royalties or to satisfy any other obligations, accrued hereunder prior to the date of such termination.  Upon termination by Licensee, all product designs developed under this Agreement shall be owned free and clear by Licensor.

     If Licensee terminates this agreement for cause, it shall so specify in the notice above.

2.   **Termination by Licensor.**

     **Option of Licensor:**  Licensor may, at its option, terminate this agreement by written notice to Licensee in case of:

     a.   Default in the payment of any royalties required to be paid by Licensee to Licensor hereunder, provided such default continues for a period of thirty (30) days after Licensor shall have given Licensee written notice of such default.

     b.   Failure on the part of the Licensee to meet the minimum buy requirements of Paragraph 3 of Article II for which the Designated Market minimum buy requirement is not met.

     c.   Default in the making of any reports required hereunder, provided such default continues for a period of thirty (30) days after Licensor shall have given Licensee written notice of such default.

     d.   Default in the performance of any other material obligation contained in this Agreement on the part of Licensee to be performed, provided such default shall continue for a period of thirty (30) days after Licensor shall have given Licensee written notice of such default.

     e.   Adjudication that Licensee is bankrupt or insolvent.

6

3.  **Effect of termination**.

    Termination of this Agreement shall not in any way operate to impair or destroy any of Licensee's or Licensor's rights or remedies, either at law or in equity, or to relieve Licensee of any of its obligations to pay royalties or to comply with any other of the obligations hereunder, accrued prior to the effective date of termination, including any obligations that specifically survive termination of this Agreement.

### ARTICLE VII - NOTICES, ASSIGNEES

1.  **Notices.** Notices and payments required hereunder shall be deemed properly given if duly sent by first class mail and addressed to the parties at the addresses set forth above. The parties hereto will keep each other advised of address changes.

2.  **Assignment.** This Agreement shall not be assigned by either party without the consent of the other party, which consent shall not be unreasonably withheld. Furthermore, Licensor shall not assign its rights to the patentable steerable antenna technology used in the Licensed Antenna Systems without the consent of Licensee, which consent shall not be unreasonably withheld.

### ARTICLE VIII - MISCELLANEOUS

1.  **Governing Law.** This Agreement is governed by and shall be construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws rules.

2.  **Exclusive Agreement.** This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter thereof, and supersedes all prior agreements, representations and understandings of the parties, written or oral.

3.  **No representations** or warranties regarding intellectual property rights of third parties. No representations or warranty is made by Licensor that the Licensed Antenna Systems are, used, sold or leased under the Exclusive License granted herein are or will be free of claims of infringement of patent rights of any other person or persons. The Licensor warrants that it has the ability to enter into this Agreement regarding the Licensed Antenna Systems.

4.  **Indemnity.** Licensee shall indemnify, hold harmless, and defend Licensor and its trustees, officers, employees and agents against any and all allegations and actions for death, illness, personal injury, property damage, and improper business practices arising out of the use of the Licensed Antenna Systems. Licensor shall not knowingly incorporate in the Licensed Antenna System any intellectual property owned by a third party without obtaining license to such intellectual property at Licensor's expense.

7

5. **Confidentiality**. The parties agree to maintain discussions and proprietary information revealed pursuant to this Agreement in confidence, to disclose them only to persons within their respective organizations having a need to know, and to furnish assurances to the other party that such persons understand this duty on confidentiality.

6. **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

7. **Amendment**. This Agreement may be amended only by written agreement of the parties.

8. **Further Assurances**. The parties shall execute such further documents and do any and all such further things as may be necessary to implement and carry out the intent of this Agreement.

In witness whereof, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

The effective date of this Agreement is November 27th 2013.

**Licensor:**     Spectrum Five LLC

Signature: _____

Name:     R. David Wilson

Title:     Chief Executive Officer


**Licensee:**     NematicITO Inc.

Signature: _____

Name:     Dedi David Haziza

Title:     Chief Executive Officer

8

**Attachment I: Description of the Waveguide Technology Covered by the Exclusive Licensing Agreement.**

**1. Description and List of Patents: for waveguide and soft switch technology**

1. US Patent 7656359 -  Multi-Beam/Scanning RF Feeds and Arrays – Waveguide Antenna technology core.
2. US Patent 7884779 -  Low Loss Multiple Input soft-switch technology.
3. US Patent Pending - Application Number 61905280 covering the following:
   a. Dual Polarization Array and Feeds.
   b. Phase/Frequency shifting waveguide and Array.
   c. Polarizing Radiating elements
   d. Planar wave-spider feeds, wide range scanning.

Fig 12B describes a certain realization of the dual polarization, flat waveguide antenna array with two reflector feeds, one for each polarization. The incorporation of a multi-beam feed solution with the similar or identical array configuration will allow elevation multi-beam operation.



FIG.12B

Illustration of Dual-polarization Waveguide Array Antenna US Patent 7656359

9



**FIG.13**

Illustration of Circular Waveguide Array Antenna form US Patent 7656359

For Both Figure 13 and 12B the patented soft-switch multi-beam solution described below
will be incorporated to enable low loss elevation scanning of the antenna.

10

## 2. Issued Patents under Exclusive Licensing Agreement



US007656359B2

(12) **United States Patent**
Haziza

(10) Patent No.: **US 7,656,359 B2**
(45) Date of Patent: **Feb. 2, 2010**

(54) **APPARATUS AND METHOD FOR ANTENNA RF FEED**

(75) Inventor: Dedi David Haziza, San Jose, CA (US)

(73) Assignee: Wavebender, Inc., Santa Clara, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 162 days.

(21) Appl. No.: 11/932,361

(22) Filed: Oct. 31, 2007

(65) **Prior Publication Data**

US 2008/0117114 A1     May 22, 2008

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/695,913, filed on Apr. 3, 2007, now Pat. No. 7,466,281.

(60) Provisional application No. 60/808,187, filed on May 24, 2006, provisional application No. 60/859,667, filed on Nov. 17, 2006, provisional application No. 60/859,709, filed on Nov. 17, 2006, provisional application No. 60/890,456, filed on Feb. 16, 2007.

(51) Int. Cl.
*H01Q 13/00*     (2006.01)

(52) U.S. Cl. ...................................... 343/772; 343/786

(58) Field of Classification Search .......... 343/700 MS, 343/772, 776, 786
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,994,873 A * 8/1961 Goubau ...................... 343/753

| | | | |
|---|---|---|---|
| 3,109,174 A | * | 10/1963 | Plummer ...................... 342/368 |
| 3,305,498 A | * | 9/1965 | Child ...................... 343/705 |
| 3,818,490 A | | 6/1974 | Leahy |
| 3,942,180 A | | 3/1976 | Bassou et al. |
| 4,090,203 A | * | 5/1978 | Duncan ...................... 343/753 |
| 4,644,343 A | | 2/1987 | Schneider et al. |
| 4,782,666 A | | 11/1988 | Lier et al. |
| 5,793,334 A | | 8/1998 | Anderson et al. |
| 5,943,023 A | | 8/1999 | Sanford |
| 6,831,613 B1 | * | 12/2004 | Gothard et al. ...................... 343/579 |
| 7,030,824 B1 | * | 4/2006 | Taft et al. ...................... 343/767 |
| 2003/0038745 A1 | | 2/2003 | Lalezari et al. |
| 2003/0122724 A1 | | 7/2003 | Shelley et al. |
| 2004/0246069 A1 | | 12/2004 | Yonak et al. |
| 2005/0146478 A1 | | 7/2005 | Wang et al. |
| 2005/0170290 A1 | | 8/2005 | Huang |
| 2006/0055605 A1 | | 3/2006 | Pelot et al. |

OTHER PUBLICATIONS

International Search Report for PCT Application No. PCT/US07/24047 dated May 2, 2008.
International Search Report for PCT Application No. PCT/US07/12004 dated Jul. 7, 2008.

(Continued)

*Primary Examiner*—Shih-Chao Chen
(74) *Attorney, Agent, or Firm*—Nixon Peabody LLP; Joseph Bach, Esq.

(57) **ABSTRACT**

An RF feed is provided which is structured as a curved reflector coupled to a sidewall of a waveguide cavity. A radiation source is situated facing the curved reflector. The RF feed may be coupled to a waveguide cavity having radiation elements coupled to top surface thereof, to thereby feed an antenna array. When an antenna array is used, several curved reflector RF feeds may be used, operating in the same or different frequencies.

20 Claims, 17 Drawing Sheets



**Waveguide Array Antenna US Patent 7656359**



## (12) United States Patent
### Haziza

(10) Patent No.: **US 7,884,779 B2**
(45) Date of Patent: **Feb. 8, 2011**

(54) **MULTIPLE-INPUT SWITCH DESIGN**

(75) Inventor: **Dedi David Haziza**, Santa Clara, CA (US)

(73) Assignee: **Wavebender, Inc.**, Santa Clara, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 138 days.

(21) Appl. No.: **11/941,754**

(22) Filed: **Nov. 16, 2007**

(65) **Prior Publication Data**

US 2008/0316142 A1    Dec. 25, 2008

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/395,915, filed on Apr. 3, 2007, now Pat. No. 7,463,210.

(60) Provisional application No. 60/859,077, filed on Nov. 15, 2006, provisional application No. 60/859,077, filed on Nov. 15, 2006, provisional application No. 60/859,286, filed on Dec. 16, 2007.

(51) **Int. Cl.**
*H01Q 3/24* (2006.01)

(52) **U.S. Cl.** ........................................ **343/876**

(58) **Field of Classification Search** ............. 343/754, 343/700 MS, 876, 893

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,818,477 A | 6/1974 | Leahy | |
| 3,413,781 A | 10/1976 | Redmond | |
| 4,586,741 A * | 11/1982 | Grooden | 343/754 |
| 4,631,536 A | 2/1987 | Schneider et al. | |
| 4,754,987 A | 11/1988 | Buendel | |
| 5,051,334 A | 8/1998 | Aslakson et al. | |
| 5,043,735 A | 8/1991 | Sinford | |
| 7,012,572 B1 | 3/2006 | Choi et al. | 343/700 MS |

OTHER PUBLICATIONS

European Search Report for EU Application No. 08 15907 13-07, dated May 2, 2008.

European Search Report for EU Application No. 08 15907 13-07, dated May 2, 2008.

*Primary Examiner*—Tan Ho
(74) *Attorney, Agent, or Firm*—Novak Druce + Quigg LLP; Joseph Bach et al.

(57)    **ABSTRACT**

A switch is provided having multiple inputs including the ability to determine the operating status of the switch and the switches by providing a plurality of inputs configured for receiving an electrical signal. A plurality of switches are coupled to a plurality of respective PIN diode switches, are coupled to a receiver circuit. A set of diodes is coupled to an input. A plurality of signal lines are coupled to each one of the plurality of switches, and each of the respective switches for the plurality of inputs one of the leg conductors has a length substantially equal to λ/2, wherein λ is a wave-length in a tray.

**18 Claims, 3 Drawing Sheets**

**Soft Switch US Patent 7656359**

3. **US Patent Pending - application Number 61905280 covering the following:**
   e. **Dual Polarization Array and Feeds.**
   f. **Phase/Frequency shifting waveguide and Array.**
   g. **Polarizing Radiating elements**
   h. **Planar wave-spider feeds, wide range scanning.**


4. **Assignment Agreements between Wavebender and Dedi David Haziza for Waveguide Antenna and Soft Switch Technology**

USPTO Assignments on the Web                                                                            9/16/12 11:05 AM

                                                                        

**Assignments on the Web >** ...

## Patent Assignment Assignee Details

...

**Assignment: 2**

      Reel/Frame: 028807/0730                                                                  Pages: 2

                                        Recorded: 08/17/2012

            Attorney Dkt #: 066340-000001
               Conveyance: ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor**
  1  WAVEBENDER, INC.                                                              Exec Dt: 05/05/2012
**Assignee**
  1  HAZIZA, DEDI DAVID
      200 WINCHESTER CIRCLE #323
      LOS GATOS, CALIFORNIA 95032
**Property**
    Pat #      Pub #      App #
    7656359   US20080117114  11932361
**Correspondence name and address**

13

**Assignment: 3**

       Reel/Frame: 028807/0762                                          Pages: 2

                                  Recorded: 08/17/2012

       Attorney Dkt #: 066340-000001
            Conveyance: ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor**
1  WAVEBENDER, INC.                                     Exec Dt: 06/05/2012

**Assignee**
1  HAZIZA, DEDI DAVID
    200 WINCHESTER CIRCLE #E23
    LOS GATOS, CALIFORNIA 95032

**Property**

| Pat # | Pub # | App # |
|-------|-------|-------|
| 7856229 | US20080316142 | 11941754 |

**Correspondence name and address**
    NIXON PEABODY LLP
    401 NINTH STREET, N.W.
    SUITE 900
    WASHINGTON, DC 20004

**Attachment II: ThinAir Falcon-Ku Data Sheet**

# *Thin*  *Falcon-Ku*

### General Information (Antenna)

**Swept Volume Dimensions:** 74"L x 35"W x 4.0"H
(188cm x 89cm x 10cm)
**Transmit Band:** 13.75-14.50 GHz
**Receive Band:** 10.70-12.75 GHz
**G/T:** 15 to 18 dB/K  (12 dB/K at 20° Elev)
**EIRP:** 51 to 54 dBW (49 dBW at 20° Elev, 40W BUC)
**Transmit Power Spectral Density:** (per 47 CFR 25.222)
17 to 18 dBW/4 KHz at High Latitudes (to 65° N/S)
16 to 18 dBW/4 KHz PSD over CONUS (83W to 118W)
15 to 18 dBW/4 KHz PSD over Equator (Longitude +/- 35°)
**Geo-Plane Beamwidth (Typ):** 1.85° Transmit &  2.15° Receive
(24"H x 36"W Elliptical Dish equivalent)
**Geo-Plane Patterns (Typ):** First Sidelobe -22 dB (typical)
**Polarization:** Tracking Linear (Co-Pol or Orthogonal-Pol)
**X-pol Isolation:** 30 – 35 dB

### Tracking

**Azimuth Coverage:** 360° continuous
**Elevation Coverage:**  (+10°) +15° to +85°
**Agility (ARINC 429 NAV):**  >120°/sec, >300°/sec[2]
**Tracking Accuracy:** < 0.2°

### Environmental

**Operational Temperature:** -55°C to +74°C external
**Environmental Compatibility:** RTCA/DO-160G & MIL-STD-810G

### Performance (Dependent on Modem, Waveform & Bandwidth)

**Data Rate (Forward Link/Receive):** 65 to 90 Mbps
**Data Rate (Return Link/Transmit):** 8 to 15 Mbps

### Advantages and Benefits (relative to high profile radome antennas)

- S40K-S125K fuel savings per aircraft per year - reduced drag enabled
  by low profile
- Deflector can be reinforced for bird strike w/o affecting RF performance
- Superior equatorial performance (high skew angle operation)
- Supports 2x to 3x higher Forward Link (Receive) data rates
- Supports 4x to 8x higher Return Link (Transmit) data rates
- Fuselage-mount compatible with regional, single-aisle & dual-aisle aircraft
- Equivalent performance to a 24"H x 36"W Ku-Band Elliptical Dish Antenna
- 50% to 80% lower transponder cost (S/MB)
- Commercial and Government Ka-band
- High-reliability direct-drive gimbal

©2015 ThinKom Solutions. All rights reserved. ThinKom Solutions reserves the right, without charge, to make changes in products or documentation without notice. All trademarks and trade names are property. one trademarks of ThinKom Solutions. Ph(310) ThinKom LLC Patents and Patents Pending.



Antenna Subsystem



Antenna Control Unit



High Power Transceiver



Modem Unit

# *Thin*

*Global Connectivity*

www.thinkom.com



Single Aisle Aircraft



Regional Jet

16

# *Thin* *Falcon-Ku*

## General Information (Antenna)

**Swept Volume Dimensions:** 74"L x 35"W x 4.0"H
(188cm x 89cm x 10cm)
**Transmit Band:** 13.75-14.50 GHz
**Receive Band:** 10.70-12.75 GHz
**G/T:** 15 to 18 dB/K (12 dB/K at 20° Elev)
**EIRP:** 51 to 54 dBW (49 dBW at 20° Elev, 40W BUC)
**Transmit Power Spectral Density:** (per 47 CFR 25.222)
17 to 18 dBW/4 KHz at High Latitudes (to 65° N/S)
16 to 18 dBW/4 KHz PSD over CONUS (83W to 118W)
15 to 18 dBW/4 KHz PSD over Equator (Longitude +/- 35°)
**Geo-Plane Beamwidth (Typ):** 1.85° Transmit & 2.15° Receive
(24"H x 36"W Elliptical Dish equivalent)
**Geo-Plane Patterns (Typ):** First Sidelobe -22 dB (typical)
**Polarization:** Tracking Linear (Co-Pol or Orthogonal-Pol)
**X-pol Isolation:** 30 – 35 dB

## Tracking

**Azimuth Coverage:** 360° continuous
**Elevation Coverage:** (+10°) +15° to +85°
**Agility (ARINC 429 NAV):** >120°/sec, >300°/sec$^2$
**Tracking Accuracy:** < 0.2°

## Environmental

**Operational Temperature:** -55°C to +74°C external
**Environmental Compatibility:** RTCA/DO-160G & MIL-STD-810G

## Performance (Dependent on Modem, Waveform & Bandwidth)

**Data Rate (Forward Link/Receive):** 65 to 90 Mbps
**Data Rate (Return Link/Transmit):** 8 to 15 Mbps

## Advantages and Benefits (relative to high profile radome antennas)

- $40K-$125K fuel savings per aircraft per year - reduced drag enabled by low profile
- Deflector can be reinforced for bird strike w/o affecting RF performance
- Superior equatorial performance (high skew angle operation)
- Supports 2x to 3x higher Forward Link (Receive) data rates
- Supports 4x to 6x higher Return Link (Transmit) data rates
- Fuselage-mount compatible with regional, single-aisle & dual-aisle aircraft
- Equivalent performance to a 24"H x 36"W Ku-Band Elliptical Dish Antenna
- 50% to 80% lower transponder cost ($/MB)
- Commercial and Government Ka-band
- High-reliability direct-drive gimbal



**Antenna Subsystem**



**Antenna Control Unit**



**High Power Transceiver**



**Modem Unit**

©2014 ThinKom Solutions, Inc. All rights reserved. ThinKom, ThinSat, and ThinAir are trademarks of ThinKom Solutions, Inc. in the United States and/or other countries. All trademarks used herein are the property of their respective owners. Specifications subject to change without notice. The ThinKom Solutions, Inc. is US Patent and Trademark Office.



**Single Aisle Aircraft**



**Regional Jet**

# *Thin*

*Global Connectivity*

www.thinkom.com

# SANTA CLARA COUNTY SUPERIOR COURT
## ALTERNATIVE DISPUTE RESOLUTION
### INFORMATION SHEET

Many cases can be resolved to the satisfaction of all parties without the necessity of traditional litigation, which can be expensive, time consuming, and stressful. The Court finds that it is in the best interests of the parties that they participate in alternatives to traditional litigation, including arbitration, mediation, neutral evaluation, special masters and referees, and settlement conferences. Therefore, all matters shall be referred to an appropriate form of Alternative Dispute Resolution (ADR) before they are set for trial, unless there is good cause to dispense with the ADR requirement.

### What is ADR?
ADR is the general term for a wide variety of dispute resolution processes that are alternatives to litigation. Types of ADR processes include mediation, arbitration, neutral evaluation, special masters and referees, and settlement conferences, among others forms.

### What are the advantages of choosing ADR instead of litigation?
ADR can have a number of advantages over litigation:

- **ADR can save time.** A dispute can be resolved in a matter of months, or even weeks, while litigation can take years.

- **ADR can save money.** Attorney's fees, court costs, and expert fees can be reduced or avoided altogether.

- **ADR provides more participation.** Parties have more opportunities with ADR to express their interests and concerns, instead of focusing exclusively on legal rights.

- **ADR provides more control and flexibility.** Parties can choose the ADR process that is most likely to bring a satisfactory resolution to their dispute.

- **ADR can reduce stress.** ADR encourages cooperation and communication, while discouraging the adversarial atmosphere of litigation. Surveys of parties who have participated in an ADR process have found much greater satisfaction than with parties who have gone through litigation.

### What are the main forms of ADR offered by the Court?
**Mediation** is an informal, confidential, flexible and non-binding process in the mediator helps the parties to understand the interests of everyone involved, and their practical and legal choices. The mediator helps the parties to communicate better, explore legal and practical settlement options, and reach an acceptable solution of the problem. The mediator does not decide the solution to the dispute; the parties do.

Mediation may be appropriate when:
- The parties want a non-adversary procedure
- The parties have a continuing business or personal relationship
- Communication problems are interfering with a resolution
- There is an emotional element involved
- The parties are interested in an injunction, consent decree, or other form of equitable relief

**Neutral evaluation,** sometimes called "Early Neutral Evaluation" or "ENE", is an informal process in which the evaluator, an experienced neutral lawyer, hears a compact presentation of both sides of the case, gives a non-binding assessment of the strengths and weaknesses on each side, and predicts the likely outcome. The evaluator can help parties to identify issues, prepare stipulations, and draft discovery plans. The parties may use the neutral's evaluation to discuss settlement.

Neutral evaluation may be appropriate when:
- The parties are far apart in their view of the law or value of the case
- The case involves a technical issue in which the evaluator has expertise
- Case planning assistance would be helpful and would save legal fees and costs
- The parties are interested in an injunction, consent decree, or other form of equitable relief

*-over-*

Arbitration is a less formal process than a trial, with no jury. The arbitrator hears the evidence and arguments of the parties and then makes a written decision. The parties can agree to binding or non-binding arbitration. In binding arbitration, the arbitrator's decision is final and completely resolves the case, without the opportunity for appeal. In non-binding arbitration, the arbitrator's decision could resolve the case, without the opportunity for appeal, unless a party timely rejects the arbitrator's decision within 30 days and requests a trial. Private arbitrators are allowed to charge for their time.

Arbitration may be appropriate when:
- The action is for personal injury, property damage, or breach of contract
- Only monetary damages are sought
- Witness testimony, under oath, needs to be evaluated
- An advisory opinion is sought from an experienced litigator (if a non-binding arbitration)

**Civil Judge ADR** allows parties to have a mediation or settlement conference with an experienced judge of the Superior Court. Mediation is an informal, confidential, flexible and non-binding process in which the judge helps the parties to understand the interests of everyone involved, and their practical and legal choices. A settlement conference is an informal process in which the judge meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations. The request for mediation or settlement conference may be made promptly by stipulation (agreement) upon the filing of the Civil complaint and the answer. There is no charge for this service.

Civil Judge ADR may be appropriate when:
- The parties have complex facts to review
- The case involves multiple parties and problems
- The courthouse surroundings would be helpful to the settlement process

**Special masters and referees** are neutral parties who may be appointed by the court to obtain information or to make specific fact findings that may lead to a resolution of a dispute.
Special masters and referees can be particularly effective in complex cases with a number of parties, like construction disputes.

**Settlement conferences** are informal processes in which the neutral (a judge or an experienced attorney) meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations.
Settlement conferences can be effective when the authority or expertise of the judge or experienced attorney may help the parties reach a resolution.

*What kind of disputes can be resolved by ADR?*
Although some disputes must go to court, almost any dispute can be resolved through ADR. This includes disputes involving business matters; civil rights; collections; corporations; construction; consumer protection; contracts; copyrights; defamation; disabilities; discrimination; employment; environmental problems; fraud; harassment; health care; housing; insurance; intellectual property; labor; landlord/tenant; media; medical malpractice and other professional negligence; neighborhood problems; partnerships; patents; personal injury; probate; product liability; property damage; real estate; securities; sports; trade secret; and wrongful death, among other matters.

*Where can you get assistance with selecting an appropriate form of ADR and a neutral for your case, information about ADR procedures, or answers to other questions about ADR?*

*Contact:*
Santa Clara County Superior Court                          Santa Clara County DRPA Coordinator
ADR Administrator                                                    408-792-2784
408-882-2530